# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

LEE BORNTRAGER,
DONALD P. BYERS,
JAMES C. CHAPMAN,
RAYMOND D. NORTHRUP,
JAMES L. SADDLER,
THOMAS ST. JOHN,
CRST FLATBED, INC., and
CRST VAN EXPEDITED, INC.,

      Plaintiffs,

vs.

CENTRAL STATES, SOUTHEAST
AND SOUTHWEST AREAS
PENSION FUND,

      Defendant.

No. C02-0139

RULING ON MOTIONS FOR
SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  **RELEVANT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *A.*   *The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *B.*   *The Agreements* . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        *1.*   *Collective Bargaining Agreements* . . . . . . . . . . . . . . 5
        *2.*   *Central States' Trust Agreement* . . . . . . . . . . . . . . 6
        *3.*   *Participation Agreement* . . . . . . . . . . . . . . . . . . 7
    *C.*   *The Expulsion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.  **LEGAL STANDARD FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . 9

V.   **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    *A.*   *Plaintiff's Motion for Summary Judgment* . . . . . . . . . . . . 10
        *1.*   *Does the Trust Agreement Violate Federal Labor Law?* . . . . 11

      2.     *Did Central States Act Arbitrarily and Capriciously in Determining that CRST Violated the Adverse Selection Policy?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      3.     *Was the Expulsion Arbitrary and Capricious Because it was not Applied Equally to UPS?* . . . . . . . . . . . . . . . . . . . . . 20

      4.     *Did Central States Act in Bad Faith or Have an Improper Motive?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   B.    *Defendant's Motion for Summary Judgment* . . . . . . . . . . . . . . . 23

   C.    *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**VI. ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## *I. INTRODUCTION*

On the 20th day of December 2007, this matter came on for telephonic hearing on the Motion for Summary Judgment (docket number 117) filed by the Plaintiffs on October 1, 2007, and the Motion for Summary Judgment (docket number 118) filed by the Defendant on the same date. The Plaintiffs were represented by their attorneys, Herve H. Aitken, Kevin Williams, and Robert E. Konchar. The Defendant was represented by its attorney, John J. Franczuk, Jr.

## *II. PROCEDURAL HISTORY*

This case has a lengthy procedural history. On September 24, 2002, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief (docket number 1). In addition to requesting an order declaring that Defendant "lacks the grounds" to expel Plaintiffs from Defendant's pension fund, Plaintiffs requested an injunction, prohibiting Defendant from expelling Plaintiffs pending a ruling on the merits. Following hearing, Judge Edward J. McManus filed an Order (docket number 11) on September 26, 2002, denying Plaintiffs' request for injunctive relief. With the consent of both parties, on October 24, 2002, Judge McManus referred this case to United States Magistrate Judge John A. Jarvey for final disposition.[1] *See* Order of Reference (docket number 22).

---

[1] Judge John A. Jarvey was subsequently appointed as United States District Judge (continued...)

On February 11, 2003, Plaintiffs filed a Motion to Dismiss Without Prejudice (docket number 25), seeking instead to resolve the matter through arbitration. After the Motion to Dismiss was set for hearing, however, it was withdrawn by Plaintiffs. The Motion to Dismiss was then denied as moot. *See* Order (docket number 33).

On April 17, 2003, Plaintiffs filed their First Amended and Substituted Complaint (docket number 40). The Amended Complaint added counts alleging tortious interference with a contract, a violation of ERISA, breach of contract, and disparate treatment. On May 16, 2003, Defendant filed a Motion (docket number 44) to dismiss Plaintiffs' First Amended Complaint. The Court entered an Order (docket number 52) on July 2, 2003, dismissing Counts II, III, IV, and V of the Amended Complaint, but granting Plaintiffs' Motion for Permission to Amend Further, to include "additional jurisdictional grounds which should have been included in the first amended complaint."

Plaintiffs' Second Amended and Substituted Complaint (docket number 53) was filed on July 2, 2003. On July 16, 2003, Defendant filed a Motion (docket number 57) to dismiss Plaintiffs' Second Amended Complaint, arguing that the Court lacked subject matter jurisdiction. The Motion to Dismiss was denied in an Order (docket number 68) filed on September 8, 2003.[2]

On October 21, 2003, Defendant filed a Motion for Summary Judgment (docket number 74). On December 19, 2003, Plaintiffs filed a Motion to Remand (docket number 80), requesting that the case be remanded back to Defendant's board of trustees for evaluation of documents relating to United Parcel Service ("UPS"). On February 24, 2004, the Court entered an Order (docket number 89), directing that "this matter be remanded back to the plan administrator for consideration of all relevant documents

---

[1] (...continued)
for the Southern District of Iowa. Accordingly, the case has been referred to the undersigned Magistrate Judge for final disposition.

[2] In a clarifying Order (docket number 79), the Court dismissed Counts II, III, IV, and V of the Second Amended Complaint for the same reasons that it had previously dismissed identical counts in the First Amended Complaint.

relating to UPS' alleged violation of the defendant's adverse selection policy and to allow the plaintiffs discovery on this issue."[3] According to a text entry entered on that date, Defendant's Motion for Summary Judgment was denied as moot.

On March 23, 2004, Defendant filed a Notice of Appeal (docket number 91) to the United States Court of Appeals for the Eighth Circuit. In an opinion (docket number 95) filed on October 10, 2005 (and docketed in this Court on November 14, 2005), the Eighth Circuit dismissed the appeal for lack of jurisdiction.

With the Court's permission, Plaintiffs filed a Third Amended and Substituted Complaint (docket number 103) on March 15, 2006. Plaintiffs seek a declaration that Defendant cannot retroactively expel Plaintiffs, that CRST did not violate Defendant's adverse selection policy, and that a retroactive expulsion does not trigger withdrawal liability. Plaintiffs no longer seek reinstatement to the pension plan, but rather ask for the return of the withdrawal penalty paid, plus interest, "to be distributed to the individual Plaintiffs on a pro-rata basis." On April 18, 2006, Defendant again filed a Motion to Dismiss (docket number 107), arguing that the Court lacks jurisdiction to consider Plaintiffs' expulsion. The Motion to Dismiss was denied in an Order (docket number 113) filed on March 6, 2007. On May 9, 2007, Defendant filed an Answer (docket number 114) to Plaintiffs' Third Amended and Substituted Complaint.

In compliance with Judge Jarvey's Order remanding the case "to the plan administrator for consideration of all relevant documents relating to UPS' alleged violation of the defendant's adverse selection policy," Central States' Board of Trustees met on May 15, 2007, to reconsider CRST's argument. (Plaintiffs' App. at 5-17.) The Trustees reaffirmed their prior decision to expel CRST from the pension fund. The Board concluded that it had no "duty to treat all employers equally" and further concluded that CRST was not comparable to UPS, in any event. (Plaintiffs' App. at 9.)

---

[3] *See* Order (docket number 89) at 4.

By agreement of the parties and pursuant to an Order (docket number 116), both parties filed their respective Motions for Summary Judgment on October 1, 2007.

## III. RELEVANT FACTS

### A. The Parties

Plaintiffs CRST Flatbed, Inc. and CRST Van Expedited, Inc. (collectively "CRST") are for-hire interstate motor carriers. Plaintiffs Lee Borntrager and Thomas St. John are employees of CRST and members of Teamsters Local 238. Plaintiffs Donald P. Byers, James C. Chapman, Raymond D. Northrup, and James L. Saddler are employees of CRST and members of Teamsters Local 142.

Defendant Central States, Southeast and Southwest Areas Pension Fund ("Central States") is a multiemployer employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1322a *et. seq.* Central States has approximately 2,400 participating employers and is governed by a board of trustees, consisting of ten trustee positions. Five trustees are selected by the employers and five trustees are selected by unions affiliated with the International Brotherhood of Teamsters.

Central States is a defined benefit plan which provides specified levels of benefits to participants who satisfy Central States' vesting requirements. The Central States Pension Plan document establishes forty-one benefit schedules, known as benefit classes, which differ in amount of retirement benefits provided, amount of associated contribution rates, and the availability of certain deferral privileges. When a participant retires, he receives the monthly benefit associated with his benefit class for the remainder of his life.

### B. The Agreements

#### 1. Collective Bargaining Agreements

For approximately the last thirty years, CRST has had a Collective Bargaining Agreement with the Chauffeurs, Teamsters, and Helpers Local Union 142, an affiliate of the International Brotherhood of Teamsters. The most recent Agreement became effective

on April 1, 1999, and expired on March 31, 2002.[4] (Plaintiffs' App. at 63-97.) Pursuant to an agreement, the employees of Local 142 continue to work under the terms of the Collective Bargaining Agreement which expired on March 31, 2002, "until either an impasse in negotiations is reached or a new CBA is agreed upon and signed." (Plaintiffs' App. at 292.) The Local 142 members employed by CRST are owner-operators and steel fleet drivers domiciled at CRST's East Chicago, Indiana terminal.

CRST also had a Collective Bargaining Agreement with Chauffeurs, Teamsters, and Helpers Local Union 238, affiliated with the International Brotherhood of Teamsters. The most recent contract became effective November 1, 1999, and expired on October 31, 2004. (Plaintiffs' App. at 18-62.) The members of Local 238 are mechanics and technicians assigned by CRST to the Cedar Rapids maintenance facility leased to and operated by Hawkeye, Inc. in Cedar Rapids. On June 18, 2007, however, Local 238 "disclaimed any interest" in continuing to represent the CRST mechanics working at the facility operated by Hawkeye. (Plaintiffs' App. at 138.)

### 2. *Central States' Trust Agreement*

The Central States Pension Fund is administered pursuant to a Revised and Amended Trust Agreement executed on March 16, 1955. (Plaintiffs' App. at 101-128.) The Agreement provides generally for the establishment of a Trust Fund, administered by a board of trustees, for the purpose of providing retirement benefits for union employees.

The Trust Agreement authorizes the Trustees to reject any collective bargaining agreement which they determine may impair the "actuarial soundness" of the Fund. The Trust Agreement further provides that the rejection may be retroactive to the beginning of the Collective Bargaining Agreement.

> The Trustees are authorized to reject any collective bargaining agreement of an Employer (and all contributions from the Employer) whenever they determine either that the agreement is unlawful and/or inconsistent with any rule or requirement

---

[4] It should be noted that the Agreement is between Local 142 and Malone Freight Lines, Inc. CRST Flatbed, Inc. was formerly known as Malone Freight Lines, Inc.

for participation by Employers in the Fund and/or that the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund (including but not limited to any arrangement in which the Employer is obligated to make contributions to the Trust Fund on behalf of some but not all of the Employer's bargaining unit employees, and any arrangement in which the Employer is obligated to make contributions to the Trust Fund at different contribution rates for different groups of the Employer's bargaining unit employees). Any such rejection by the Trustees of a collective bargaining agreement shall be effective as of the date determined by the Trustees (which effective date may be retroactive to the initial date of the term of the rejected agreement) and shall result in the termination of the Employer and all Employees of the Employer from further participation in the Fund on and after such effective date.

*See* Revised and Amended Trust Agreement, Article III, Sec. 1 (Plaintiffs' App. at 107).

### 3. *Participation Agreement*

In addition to the collective bargaining agreements, CRST and the local unions entered into a Participation Agreement, whereby both agreed to be bound by all of the terms of the Trust Agreement creating the Central States pension fund. (Plaintiffs' App. at 129-130.) CRST agreed to contribute to Central States "for its bargaining unit Employees."

The Employer and Union represent to the Trustees that payments will be made only on behalf of the Employees in the collective bargaining unit, excluding, by way of example but not limitation, self-employed persons and supervisors, among others.

Participation Agreement, Plaintiffs' Appendix, Exhibit 7, ¶ 6.

## C. The Expulsion

On March 29, 2002, Karl A. Lewis of Central States sent two nearly identical letters to John Smith, CEO of CRST.[5] The letters advise CRST that it "is being reviewed for potential adverse selection practices." The first letter notes that in 1990, CRST reported eight mechanics in Local 238, while in 2002 only two mechanics were reported and there had been no "new hires." Similarly, the second letter states that in 1990, CRST employed seventeen drivers in Local 142, while in 2002 there were only seven employees with no new hires. The letters advised CRST that Central States believed that it was in violation of the "policy of Adverse Selection."

In November 1990, Central States issued Special Bulletin 90-7, entitled "Split Bargaining Unit Arrangements." (Defendant's App. at 36-37.) According to the Bulletin, it was issued to emphasize Central States' "long standing policy which prohibits the Pension Fund from participating in collective bargaining arrangements which encourage 'adverse selection' and are, therefore, actuarially unsound."

> When establishing the contribution rate necessary to support a benefit level, the Trustees rely upon cost estimates of actuaries who assume that all employees of an employer in the same work classification will participate equally in the Pension Fund. However, if in practice the collective bargaining arrangement restricts pension coverage to only those employees likely to receive a benefit and excludes those employees less likely to receive a benefit, then the contribution rate is insufficient to support the benefit level. To protect the financial soundness of the Pension Fund, the Trustees must avoid this type of "adverse selection." Therefore the Trustees will terminate continued participation and reject collective bargaining arrangements which in practice result in adverse selection.

*See* Special Bulletin 90-7 (Plaintiffs' App. at 142). The Special Bulletin then provides illustrative examples of "actuarially unsound arrangements," including situations where

---

[5] *See* Third Amended and Substituted Complaint, Exhibits E and F (docket numbers 103-7 and 103-8).

not all employees covered by the Collective Bargaining Agreement participate in the pension fund; where an employer establishes a non-covered bargaining unit "which consists of employees who perform the same type of work as the covered bargaining unit"; and where reduced or no pension coverage is provided to part-time employees, when "in practice the employees are actually full-time, long-term employees." (*Id.* at 142-143.)

CRST was advised in the March 29, 2002 letters that "[w]e will be recommending the termination of [Local 238 and Local 142] from the Pension Fund because they are in violation of the Fund's policies and because they are not paying a pension rate that supports the benefit level for this group." According to the letters, the recommendation would be submitted at the Board of Trustees meeting on May 15, 2002, unless "you are willing to agree to an additional participation fee." While the record is imprecise, the matter was apparently not submitted to the Board of Trustees at its May 15, 2002, meeting. On July 16, 2002, counsel for CRST submitted a written argument claiming that it was "in compliance with the law regarding pension fund expulsion." (Defendant's App. at 22-35.) According to a letter to Plaintiffs' counsel dated July 22, 2002, the Contracts Subcommittee decided at its July 18, 2002, meeting "to reaffirm its recommendation that the Trustees terminate the participation of CRST" in the pension fund. (Plaintiffs' App. at 301-302.) At its August 21, 2002, meeting, the Board of Trustees voted to terminate CRST from the pension fund, effective September 29, 2002. (Defendant's App. at 16-21.)

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Both parties have filed for summary judgment. Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue of fact is genuine when a 'reasonable jury could return a verdict for the nonmoving party.'" *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 821 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson*, 477 U.S. at 248. The court must view the record in the light most

favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears the initial responsibility of informing the court of the basis for its motion, and must identify those portions of the record which it contends show a lack of a genuine issue of material fact. *Heisler v. Metropolitan Council*, 339 F.3d 622, 631 (8th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (same). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see, e.g., Baum v. Helget Gas Products, Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel West Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. DISCUSSION

### A. Plaintiff's Motion for Summary Judgment

In their Motion for Summary Judgment, Plaintiffs raise four issues for the Court's attention: First, Plaintiffs argue that the portion of the Trust Agreement which permits "retroactive" rejection of a collective bargaining agreement is contrary to federal labor law policy; second, Plaintiffs claim that the decision by Central States to expel CRST was "arbitrary and capricious" because the adverse selection policy does not apply to independent contractors; third, that the expulsion was "arbitrary and capricious" because it was not applied equally to UPS; and fourth, that Central States acted in bad faith and

"was motivated by freezing the benefit levels of the Plaintiff employees, who were nearing retirement or nearing higher or maximum pension benefit levels." The Court will address each of the arguments in turn.

### 1. Does the Trust Agreement Violate Federal Labor Law?

As set forth above, Article III, Sec. 1, of Central States' Revised and Amended Trust Agreement authorizes the Trustees to "reject" any collective bargaining agreement which they determine impairs the actuarial soundness of the Fund. The Trust Agreement further provides that "such rejection" shall be effective on any date determined by the Trustees, "which effective date may be retroactive to the initial date of the term of the rejected agreement." In this case, the Trustees determined at their meeting on August 21, 2002, that Local 238 and Local 142 would be terminated from participation in the Pension Fund, effective September 29, 2002.

The Collective Bargaining Agreement between CRST and Local 142 became effective on April 1, 1999, and expired on March 31, 2002. (Plaintiffs' App. at 63-97.) Accordingly, the Collective Bargaining Agreement had actually expired prior to its "rejection" by Central States. Members of Local 142 continue to work under the terms and conditions of the Collective Bargaining Agreement which expired on March 31, 2002, however, "until such time as the parties may reach impasse in their negotiations." *See* Letter of February 20, 2002, Third Amended and Substituted Complaint, Exhibit B (docket number 103-3).

The Collective Bargaining Agreement between Local 238 and CRST became effective on November 1, 1999, and expired on October 31, 2004. (Plaintiffs' App. at 18-62.) Accordingly, Central States' rejection of the Collective Bargaining Agreement and the termination of Local 238 from the Trust Fund occurred approximately three years into a five-year contract. Local 238 also reached an agreement that its members would continue to work past October 31, 2004, "until such time as the parties reach impasse in their negotiations." *See* Letter of October 26, 2004, Third Amended and Substituted Complaint, Exhibit G (docket number 103-9). On June 18, 2007, however, Local 238

11

disclaimed any further interest in representing mechanics and technicians employed by CRST and assigned to the facility on 16th Avenue SW in Cedar Rapids. (Plaintiffs' App. at 138.)

In the Memorandum of Law filed in support of their Motion for Summary Judgment, Plaintiffs concede that Central States may "refuse or not renew a CBA negotiated between an employer and a union." *See* Plaintiffs' Memorandum of Law (docket number 117-2) at 7. Plaintiffs argue, however, that Central States should not be permitted to retroactively reject a collective bargaining agreement or terminate coverage during the pendency of the agreement. Plaintiffs assert that "[w]hile ***Plaintiffs do not contest the right of the Fund to reject an expired agreement*** that they deem financially harmful to the plan, the Fund can accomplish that objective upon expiration of the CBA, which typically occurs every three or four years." *See Id.* at 8 (emphasis added). The Collective Bargaining Agreement between CRST and Local 142 expired on March 31, 2002. Local 142 was terminated from participation in the pension fund effective September 29, 2002. Accordingly, the Collective Bargaining Agreement with Local 142 was not rejected by Central States until after it had expired.

The Collective Bargaining Agreement between Local 238 and CRST was rejected by Central States, however, with two years remaining in its term.[6] Plaintiffs characterize Central States' decision to terminate Local 238 as a "retroactive rejection" of the Collective Bargaining Agreement. Central States characterizes the termination as prospective, albeit during the middle of the term of the Collective Bargaining Agreement.

In both the Collective Bargaining Agreement between Local 238 and CRST, and the Participation Agreement signed by Local 238 and CRST, Plaintiffs agreed to be bound by

---

[6] The Collective Bargaining Agreement subsequently expired on October 31, 2004, however, and Local 238 has now disclaimed any further interest in representing mechanics employed by CRST at the 16th Avenue facility.

the terms of Central States' Trust Agreement.[7] Now, however, Plaintiffs argue that Central States' Trust Agreement, which permits "retroactive rejection" of a collective bargaining agreement, is unlawful. In support of that argument, Plaintiffs argue generally that permitting such action promotes disharmony between unions and employers and, therefore, violates "federal labor policy." In addition, Plaintiffs argue that "[a] retroactive rejection of a signed and accepted agreement violates normal contract law." *See* Plaintiffs' Memorandum of Law (docket number 117-2) at 13.

Plaintiffs do not point to any statute or case which prohibits plan Trustees from terminating coverage during the term of a collective bargaining agreement. Rather, Plaintiffs note that if an employer withdraws from a multiemployer plan, then the employer is liable to the plan for a withdrawal penalty. *See* 28 U.S.C. § 1381 et seq. Plaintiffs reason that since the United States Code refers to withdrawal by an employer, but does not explicitly authorize an expulsion of an employer during the term of a collective bargaining agreement, then such an expulsion is prohibited by law. Plaintiffs do not, however, cite any authority for that proposition.

Article III, Sec. 1 of the Trust Agreement authorizes the Trustees to reject any collective bargaining agreement whenever they determine that the agreement impairs the actuarial soundness of the Fund. Plaintiffs do not challenge the lawfulness of that provision, conceding that Central States may "refuse or not renew" a collective bargaining agreement. Article III, Sec. 1, further provides that the rejection of a collective bargaining agreement "shall be effective as of the date determined by the Trustees." Plaintiffs claim

---

[7] In Article 33, ¶ J, of the Collective Bargaining Agreement between Local 238 and CRST, CRST authorized the Trustees "to enter into appropriate trust agreements necessary for the administration of such Fund . . . and ratifying all actions already taken or to be taken by such Trustees within the scope of their authority." (Plaintiffs' App. at 55) In the Participation Agreement, Local 238 and CRST agreed that "[t]he Union and the Employer agree to be bound by, and hereby assent to, all of the terms of the Trust Agreement. . . ." *See* Participation Agreement, ¶ 1 (Plaintiffs' App. at 129).

that this provision, to the extent it authorizes termination of plan participants during the term of a collective bargaining agreement, is unlawful.

Nothing in the Code prohibits a multiemployer plan from rejecting a collective bargaining agreement, or restricts when such an expulsion may occur. Plaintiffs claim that a "retroactive" expulsion is prohibited by federal labor law finds no statutory or case support. *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985) ("Under the common law of trusts, as under the Central States trust agreements, trustees are understood to have all 'such powers as are necessary or appropriate for the carrying out of the purposes of the trust.'"). Thus, the Trustees in this case had not only the authority, but the fiduciary obligation, to take appropriate action to ensure the financial integrity of the fund. That includes establishing the effective date of participants' termination.

Furthermore, Central States' decision to terminate Local Unions 142 and 238 from participation in the Pension Fund does not violate any contract. Pursuant to the terms of the Trust Agreement, the Trustees have a fiduciary obligation to the beneficiaries of the Trust to take appropriate action in order to safeguard the soundness of the Trust. *Id.* at 572 ("One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets."). In performing their fiduciary duty, the trustees are governed by the provisions of the trust agreement and are not bound by contrary provisions of subsequent collective bargaining contracts entered into between the employer and the union. *Sinai Hospital of Baltimore, Inc. v. National Benefit Fund for Hospital & Healthcare Employees*, 697 F.2d 562, 564 (4th Cir. 1982); *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir. 1989).

Plaintiffs argue that because Central States is a third-party beneficiary of the Collective Bargaining Agreements and may enforce the terms of the Agreements against an employer that fails to make the required pension contributions, it follows that "the employer has the reciprocal right to enforce the terms against the Fund that has accepted the agreement." The United States Supreme Court rejected a similar argument, however,

in *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364 (1984). There, the employers argued "that as third-party beneficiaries of the collective-bargaining agreements, the trustees are bound by the arbitration clauses provided therein to the same extent that the Union would be if it were seeking judicial enforcement of those agreements." *Id.* at 370. The Court rejected that argument, however, concluding that nothing in the trust agreement suggested that the trustees intended to be bound by the terms of an individual collective bargaining agreement.[8] Accordingly, even though CRST agreed in the Collective Bargaining Agreements to contribute to Central States' pension fund on the employees' behalf, nothing in the Collective Bargaining Agreements may limit the trustees' authority to exercise the powers provided to them under the Trust Agreement. *Sinai Hospital*, 697 F.2d at 568 ("To say, however, that by accepting and collecting such contributions the trustees are bound by all of the terms of the collective bargaining

---

[8] According to the Court-

> This is not surprising. These are multiemployer trust funds. Each of the participating unions and employers has an interest in the prompt collection of the proper contributions from each employer. Any diminution of the fund caused by the arbitration requirements of a particular employer's collective-bargaining agreement would have an adverse effect on the other participants. The enforcement mechanisms established in the trust agreements protect the collective interests of the parties from the delinquency of individual employers by allowing the trustees to seek prompt judicial enforcement of the contribution requirements. It is unreasonable to infer that the parties would agree to subordinate those mechanisms to whatever arbitration procedures might be required by a particular employer's collective-bargaining agreement. In the absence of evidence to the contrary, therefore, we will not infer that the parties of two multiemployer trust funds intended to condition the trustees' enforcement authority on the arbitration procedures contained in petitioners' separate collective-bargaining agreements.

466 U.S. at 373-374.

agreement would be to completely dissipate the law of trusts, leaving employee benefit funds vulnerable to the recurring whims of employer/union bargainers.").

In summary, the Court concludes that just as the Trust Agreement authorizes the Trustees to reject any collective bargaining agreement which they determine may impair the actuarial soundness of the Fund, so too does it authorize the Trustees to establish an effective date for the termination. This provision does not violate any federal statute, and it is consistent with the common-law regarding trusts and contracts.

### 2. Did Central States Act Arbitrarily and Capriciously in Determining that CRST Violated the Adverse Selection Policy?

Plaintiffs argue that Central States' decision to expel CRST and the individual Plaintiffs based on an alleged violation of the "adverse selection" policy was "arbitrary and capricious." In support of their argument, Plaintiffs rely primarily on Special Bulletin 90-7 (Plaintiffs' App. at 142-143). In that Bulletin, all local unions and employers were reminded of "the Board of Trustees' long standing policy which prohibits the Pension Fund from participating in collective bargaining arrangements which encourage 'adverse selection.'" The Special Bulletin further advised:

> [I]f in practice the collective bargaining arrangement restricts pension coverage to only those employees likely to receive a benefit and excludes those employees less likely to receive a benefit, then the contribution rate is insufficient to support the benefit level. To protect the financial soundness of the Pension Fund, the Trustees must avoid this type of "adverse selection." Therefore, the Trustees will terminate continued participation and reject collective bargaining arrangements which in practice result in adverse selection.

Special Bulletin 90-7 (Plaintiffs' App. at 142).

Plaintiffs seize upon language in the Special Bulletin which requires all employees similarly situated to be treated equally. CRST notes that all of its employees who were covered by the collective bargaining agreements were included in the pension fund and contributions were made on their behalf. Nothing in the Special Bulletin specifically prohibits employers from replacing departing employees with independent contractors,

who necessarily cannot be included in the pension fund. *See* Participation Agreement (Plaintiffs' App. at 129) ¶ 6 ("payments will be made only on behalf of Employees in the collective bargaining unit"). *See also* 29 U.S.C. §§ 1002(6) and (7). Plaintiffs argue that since the hiring of independent contractors does not violate the collective bargaining agreements or Special Bulletin 90-7, and since all of the employees who were covered by the collective bargaining agreements were included in the pension fund, they did not violate Central States' adverse selection policy and their expulsion from the fund for that reason was arbitrary and capricious.

In response, Central States argues that the references to employees in Special Bulletin 90-7 was intended to be illustrative only. According to Central States, nothing in Special Bulletin 90-7 limits the policy against adverse selection to employees and the Bulletin "merely gives the most common examples which involve employees." *See* Memorandum in Resistance to Plaintiffs' Motion for Summary Judgment (docket number 120-1) at 7. Instead, Central States focuses on the broad authority granted to the trustees in the Trust Agreement. *Central Hardware Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 770 F.2d 106, 108 (8th Cir. 1985) ("[B]oth the powers and obligations of the trustees are to a large degree determined by the provisions of the trust documents."). The Trust Agreement does not limit the trustees' authority to reject collective bargaining agreements to instances where bargaining unit employees are being treated unequally, but instead grants broad authority to reject a collective bargaining agreement whenever an employer's "practices or arrangements" threaten the well-being of the Fund.

> The Trustees are authorized to reject any collective bargaining agreement of an Employer (and all contributions from the Employer) whenever they determine either that the agreement is unlawful and/or inconsistent with any rule or requirement for participation by Employers in the Fund and/or that *the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund* (including but not limited to any arrangement in which the

Employer is obligated to make contributions to the Trust Fund on behalf of some but not all of the Employer's bargaining unit employees, and any arrangement in which the Employer is obligated to make contributions to the Trust Fund at different contribution rates for different groups of the Employer's bargaining unit employees).

*See* Revised and Amended Trust Agreement, Article III, Sec. 1 (Plaintiffs' App. at 107) (emphasis added).

Thus, pursuant to the Trust Agreement, the Trustees may reject a collective bargaining agreement if they find the employer "is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund." While Special Bulletin 90-7 included "examples [which] illustrate actuarially unsound arrangements," it notes that the examples are "not exhaustive." There is no evidence that in publishing Special Bulletin 90-7, Central States intended to restrict or limit the authority of the Trustees to act pursuant to the Trust Agreement.

The prohibition against "adverse selection" is based on "a universal actuarial assumption that the contributions of new members who replaced retiring members will be used in part to pay the benefits due retired members." *Central Hardware*, 770 F.2d at 110 (cited with approval in *Borntrager v. Central States, Southeast and Southwest Areas Pension Fund*, 425 F.3d 1087, 1089 (8th Cir. 2005)). As noted by the Court in *Central Hardware*, the trustees have an "obligation under ERISA to act solely in the interest of and for the exclusive purpose of providing benefits to the participants and beneficiaries." 770 F.2d at 111 (citing 28 U.S.C. § 1104(a)(1)(A)(i)).

In the instant action, Central States determined that CRST was replacing departing employees with independent contractors, thereby depriving the Fund of contributions by new members to be "used in part to pay the benefits due retiring members." Since 1990, the number of mechanics employed by CRST in Local 238 has dropped from eight to two, with no new hires. Similarly, the number of drivers employed by CRST in Local 142 has dropped since 1990 from seventeen to seven, with no new hires. Central States could

easily conclude that CRST's practice of replacing departing employees with independent contractors threatened to cause economic harm to, and impairment of the actuarial soundness of, the Fund.

The Trust Agreement gives Central States the authority to expel and reject payments from participating employers which threaten its actuarial soundness. *Central Hardware*, 770 F.2d at 110 ("We agree with the contention of [Central States] that the trust agreement gives it authority to reject payments from participating employees which threaten its actuarial soundness."). Pursuant to Article III, Sec. 1 of the Trust Agreement, the Trustees were authorized to reject the collective bargaining agreements and, indeed, may have had a fiduciary obligation under ERISA to do so. Furthermore, Article IV of the Trust Agreement requires the Trustees to "care for and protect the Trust Fund." *See generally*, *Central Hardware*, 770 F.2d at 109-110. The Trustees' interpretation of the Trust Agreement is given "significant weight," *Central States, Southeast and Southwest Area Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 568 (1985); *Central Hardware*, 770 F.2d at 110, particularly in view of Article IV, Sec. 17 of the Trust Agreement:

> The Trustees, by majority action, shall have the power to construe the provisions of this Agreement and the terms and regulations of the Pension Plan; and any construction adopted by the Trustees in good faith shall be binding upon the Union, Employees and Employers. The Trustees are vested with discretionary and final authority in construing plan documents of the Pension Fund.

*See* Revised and Amended Trust Agreement, Article III, Sec. 1 (Plaintiffs' App. at 115). *See also Central Transport*, 472 U.S. at 570 ("Under the common law of trusts, as under the Central States trust agreements, trustees are understood to have all 'such powers as are necessary or appropriate for the carrying out of the purposes of the trust.'").

Once it is determined that the Trustees have the authority to expel plan participants, then the Court's review of the propriety of their actions "is limited to a determination of whether the Trustees' decision is arbitrary, capricious, or an abuse of discretion." *Central*

*Hardware*, 770 F.2d at 109. "Under the arbitrary and capricious standard, a court should uphold the trustees' decision as long as it is rational in light of a plan's provisions." *Slenczka v. Central States, Southeast and Southwest Areas Pension Fund*, 2006 WL 2042520 (E.D. Mich.) at *3. *See also Fort Transfer Company v. Central States, Southeast and Southwest Areas Pension Fund*, 2007 WL 707545 (N.D. Ill.) at *8 ("The court cannot say that the Trustees' decision to expel Fort Transfer was arbitrary and capricious, and it clearly is supported by the record before this court.").

There is substantial evidence to support the Trustees finding that CRST's practices threatened economic harm to, and/or impairment of the actuarial soundness of, the Fund. The Trustees' decision was rationally related to their obligation to safeguard trust assets. The Court concludes that Central States' adverse selection policy is not limited in the way suggested by Plaintiffs and its decision to expel Plaintiffs for violating the policy was not arbitrary or capricious, or an abuse of discretion.

### 3. Was the Expulsion Arbitrary and Capricious Because it was not Applied Equally to UPS?

Plaintiffs argue that Central States failed to consistently apply its adverse selection policy to CRST and United Parcel Service ("UPS"), and the expulsion of CRST was therefore "arbitrary and capricious." In an Order (docket number 89) filed on February 24, 2004, the Court remanded this matter back to the trustees "for consideration of all relevant documents relating to UPS' alleged violation of the defendant's adverse selection policy and to allow the plaintiffs discovery on this issue."[9] In a subsequent Order (docket

---

[9] On appeal, the Eighth Circuit Court of Appeals concluded that the trustees were not *required* to allow discovery.

> The district court lacks statutory authority to *compel* an ERISA plan administrator to conduct or permit discovery. Here, by remanding for 'further development of the record,' the district court has intimated that it would refuse to uphold the decision to expel CRST on the existing record. But Central States remains free, on remand, to confirm or reinstate the expulsion order on the existing record and then defend its decision in the

(continued...)

number 113) filed on March 6, 2007, the Court ordered that "[o]n remand, the Board shall explain how its decision to expel CRST was not arbitrary and capricious as compared to its treatment of UPS." Following remand, the Central States' Board of Trustees met on May 15, 2007, to reconsider CRST's argument. Citing the "vast differences between UPS and CRST," the Trustees reaffirmed their decision to expel Plaintiffs from the Pension Fund, effective September 29, 2002. *See* Minutes of the Pension Board Meeting--May 15, 2007 (Plaintiffs' App. at 5-17).

In support of their argument that Central States acted arbitrarily and capriciously in treating CRST and UPS differently, Plaintiffs cite *Lickteig v. Businessmen's Assurance Company of America*, 61 F.3d 579 (8th Cir. 1995), and *Finley v. Special Agents Mut. Ben. Ass'n, Inc.*, 957 F.2d 617 (8th Cir. 1992). There, the Court applied a five-factor analysis in determining whether the plan administrators abused their discretion in denying a participant benefits under the plan.

> Reviewing Central States' interpretation of its plan language requires us to examine the following factors: 1) whether the interpretation is consistent with the goals of the Central States Plan; 2) whether it renders any language in the Central States Plan meaningless or internally inconsistent; 3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; 4) whether Central States has interpreted the provisions at issue here consistently; and 5) whether the interpretation is contrary to the clear language of the Central States Plan.

*Lickteig*, 61 F.3d at 583-584 (citing *Finley*, 957 F.2d at 621). In this case, Plaintiffs focus on the fourth *Finley* factor, and argue that Central States did not interpret the trust agreement consistently when it expelled CRST, but did not expel UPS.

---

[9](...continued)
district court.
*Borntrager v. Central States, Southeast and Southwest Areas Pension Fund*, 425 F.3d 1087, 1093 (8th Cir. 2005) (emphasis in original).

As noted by the Trustees in the Minutes of their May 15, 2007 meeting, however, there is a substantial factual distinction between CRST and UPS. Significantly, between 1990 and 2002, the number of covered mechanics employed by CRST dropped from eight to two, with no new hires. Similarly, the number of covered drivers dropped during the same period of time from seventeen to seven, with no new hires. During that time, CRST was replacing departing employees with independent contractors. Conversely, the number of covered employees employed by UPS increased during the same time from 31,379 to 40,697, or nearly 30 percent. Furthermore, the average participant age of UPS employees was below the national average for Central States' plan participants, while the average age of CRST's employees was substantially above the national average.

The Court does not find an inconsistency in expelling Plaintiffs from the Plan, while not taking any action against UPS. As set forth in Part V (A)(2) above, the Trustees are guided primarily by the terms of the Trust Agreement, rather than the illustrative provisions of Special Bulletin 90-7. Specifically, the Trustees must determine whether "the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund." *See* Revised and Amended Trust Agreement, Article III, Sec. 1 (Plaintiffs' App. at 107). Stated simply, CRST's practice of replacing departing employees with non-covered independent contractors threatened the actuarial soundness of the Fund, while UPS' practice of not covering part-time employees does not. The Trustees' decision to expel one and not the other was not arbitrary or capricious, or an abuse of discretion.

### 4.     *Did Central States Act in Bad Faith or Have an Improper Motive?*

Finally, Plaintiffs assert that "[t]he Fund was motivated by freezing the benefit levels of the Plaintiff employees, who were nearing retirement and nearing higher or maximum pension benefit levels, after accepting pension contributions on behalf of these employees for approximately 30 years." *See* Memorandum of Law in Support of Motion for Summary Judgment at 19 (docket number 117-2 at 23). It would appear, however, that this assertion is simply an extension of Plaintiffs' argument that Central States acted

arbitrarily and capriciously in expelling Plaintiffs from the Plan. Plaintiffs speculate that Central States "wait[ed]" until 2002 to expel CRST" in order to "freeze benefits before several of the individual Plaintiffs, nearing retirement, achieved higher or maximum pension levels." *See Id.* at 20 (docket number 117-2 at 24). There is no evidence, however, that the Trustees were motivated by bad faith. Rather, the Trustees exercised the discretion afforded them by the Trust Agreement to take those actions necessary to protect the actuarial soundness of the Fund.

## B. *Defendant's Motion for Summary Judgment*

In its Motion for Summary Judgment (docket number 118), Central States argues that pursuant to the terms of the Trust Agreement, the Trustees have the discretion to expel an employer whose actions threaten economic harm to the Fund or impair its actuarial soundness. Given the deferential "arbitrary and capricious" standard to be applied by the Court, Central States argues that Plaintiffs' Third Amended and Substituted Complaint challenging the expulsion should be summarily dismissed. Furthermore, Central States argues that the relief being sought by Plaintiffs is "unavailable."

In Part V(A) above, the Court addressed Plaintiffs' arguments that their expulsion from the Fund was arbitrary and capricious. For the reasons set forth above, the Court rejected the Plaintiffs' argument. For the same reasons, the Court concludes that Central States is entitled to summary judgment. The Court believes that the Trustees' decision was a reasonable application of their policy against adverse selection, was a rational application of the terms of the Trust Agreement, and was not an abuse of their discretion. Therefore, the Court concludes that Plaintiffs' claims fail and Defendant is entitled to summary judgment.

Central States also argues that the relief sought by Plaintiffs is unavailable in any event. Initially, Plaintiffs asked that the expulsion be set aside and they be reinstated. As noted above, however, Local 238 has disclaimed any interest in representing the two remaining mechanics employed by CRST, and the four drivers employed by CRST who

are members of Local 142 no longer have an interest in being reinstated to the Fund.[10] Rather, CRST requests a refund of the withdrawal penalty which it previously paid, plus interest, "to be distributed to the individual Plaintiffs on a pro-rata basis." Given the Court's conclusions regarding the parties' respective Motions for Summary Judgment, it is unnecessary to determine whether Plaintiffs would be entitled to the relief sought in the Third Amended Complaint.

## C. Summary

In summary, the Court concludes that the Revised and Amended Trust Agreement governing Defendant's Pension Plan authorizes the Trustees to deny participation by employers who are engaged in practices or arrangements which threaten to cause economic harm to the Fund or impair its actuarial soundness. The Trust Agreement further authorizes "such rejection by the Trustees" to be effective on a date determined by the Trustees. These provisions in the Trust Agreement do not violate federal labor law. In reviewing the actions of the Trustees, the Court must apply the discretionary "arbitrary and capricious" standard. The Court concludes that the Trustees' decision to expel Plaintiffs from the Plan was consistent with the goals of the Plan, complied with the language of the Trust Agreement, did not conflict with substantive or procedural requirements of ERISA, and was not "contrary to the clear language" of the Plan. To the extent that Central States treated CRST and UPS differently, the Court concludes that there are reasonable and actuarially sound reasons for doing so. Therefore, the Court finds that the Trustees' decision was not arbitrary or capricious, or an abuse of discretion. Defendant is entitled to summary judgment.

---

[10] According to their Motion, "CRST would not seek reinstatement because the Fund's underfunding has increased greatly from $4,956,908,170 in 2002 to $17,614,021,210 in 2007 and CRST does not want to be reinstated in this grossly underfunded Fund." Plaintiffs' Motion for Summary Judgment (docket number 117-1), at 5.

## VI. ORDER

IT IS THEREFORE ORDERED as follows:

1.      The Motion for Summary Judgment (docket number 117) filed by Plaintiffs on October 1, 2007, is hereby **DENIED**.

2.      The Motion for Summary Judgment (docket number 118) filed by the Defendant on October 1, 2007, is hereby **GRANTED**.

3.      The Third Amended and Substituted Complaint (docket number 103) filed on March 15, 2006, is hereby **DISMISSED**.

DATED this 22nd day of April, 2008.

JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA